```
                IN THE UNITED STATES DISTRICT COURT
             FOR THE EASTERN DISTRICT OF PENNSYLVANIA
```

| | |
|---|---|
| LESLAW J. KORNECKI,       : | Civil Action |
|       Plaintiff,    : | |
|                        : | No.: 02-CV-3708 |
|     v.                      : | |
| TEMPLE UNIVERSITY HOSPITAL, : | |
|       Defendant.    : | |

**DEFENDANT TEMPLE UNIVERSITY HOSPITAL'S MEMORANDUM OF LAW IN
SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT**

      Defendant Temple University Hospital ("Temple" or the "Hospital"), whose proper corporate name is Temple University-Of the Commonwealth System of Higher Education, hereby moves for summary judgment as to the sole remaining count (FMLA Violation) of the complaint.

**I.    PROCEDURAL AND FACTUAL BACKGROUND**

    As with the motion for summary judgment as to the defamation claim (unopposed by the plaintiff), this case stems from the Hospital's discharge of Mr. Kornecki on March 4, 2002 after an investigation revealed that plaintiff bought pornographic movies and accessed, viewed, and downloaded pornography to Temple computers during his employment. This misconduct qualified as "misuse of Temple property" [computers]

and "conduct unbecoming a Temple employee," which are explicit grounds for discharge under Temple University Hospital's personnel policies. Although plaintiff admits participating in this conduct, at least to some degree, he denies that he accessed, viewed and downloaded <u>all</u> of the pornography that is apparent on his computers. Moreover, he admits to purchasing only some of the pornographic movies for which purchase confirmations appeared in <u>his</u> Temple e-mail files.

Regardless of plaintiff's equivocating, there is no factual dispute concerning whether plaintiff engaged in conduct for which the Hospital appropriately discharged him, only the quantity of pornography he consumed via Temple computers. As a result, there is no <u>genuine</u> issue of <u>material</u> fact for a jury to decide since it is true that plaintiff accessed pornography while he was working and, therefore, Mr. Kornecki was in violation of the Hospital work rules and common decency, and termination was appropriate.

    **A.    Plaintiff admits accessing pornographic websites and purchasing pornographic DVD's using Temple computers.**

Plaintiff admits that on at least one occasion, on December 27, 2001, during work hours, he browsed for, and then ordered, three (3) pornographic DVD's using Hospital computers. Kornecki Deposition, pages 149-50, attached as Exhibit 1; <u>see also</u> Exhibit 3. Those videos were entitled: (1) "Assbusters"; (2) "Climax Shots #2: New Booty"; and (3) "Euro Hardriders 3."

2

Plaintiff admits that he ordered these pornographic DVD's from a website called www.adulteyes.com.[1] He also admits that he browsed titles while searching for the three he purchased. <u>See</u> Exhibit 1, p. 160. After completing the sale, Adult Eyes even sent the receipt for the purchase of the pornographic movies to plaintiff's <u>Temple</u> e-mail address. A copy of that e-mail receipt is attached hereto as Exhibit 3.

Plaintiff also does not dispute that he used his Temple desktop computer on no less than fifteen (15) other occasions to view the AdultEyes website wherein he perused other adult video titles. Exhibit 1, pp. 160-161; <u>See</u> Exhibit 2.[2] Knowing his DVD purchases were discovered by Temple and his adulteyes.com web activity was clear from his computer records, plaintiff conceded this point at his deposition. <u>See</u> Exhibit 1, pp.160-161.

Plaintiff also admitted that on an additional fifteen (15) other occasions he viewed on his work computer other websites that sold pornographic DVD's or displayed pornographic

---

[1] Examples of the types of movie covers plaintiff was perusing during work hours are shown in Exhibits 6 & 9.

[2] Exhibit 2 is a chronology of dates and times that websites were accessed on the desktop computer that Temple provided to plaintiff. The list has been condensed to show the times "adulteyes.com" and some of the other pornographic DVD websites were accessed, even though other pornographic DVD purchasing sites and pornographic websites are listed in the documents not produced for the purposes of this motion.

images.  Exhibit 1, pg. 162-3, 165.[3]  Plaintiff testified that he did not know whether there was censored or uncensored pornography on those web pages, Exhibit 1, pg. 162-3, 165, but the websites had names, including adultmovies.com[4]; AshleyNChad.com[5]; xxxbuster.com; and 3xvideorental.com.

These admissions alone are sufficient justification for Temple to discharge the plaintiff given the severity of the violation and the plaintiff's utter disregard for Temple's reputation and its rules.  Exhibit 16, pp. TEMPLE 0342-0344.

**B.   Despite Plaintiff's denials, it is clear that he bought additional pornography from Temple's computers.**

Although Mr. Kornecki claims that he only purchased pornography on his Hospital computer on one occasion, e-mails that he received at his Temple e-mail address refute this contention.  In fact, plaintiff received <u>four (4)</u> other separate e-mails from adulteyes.com confirming the purchase of five additional videos during work hours.  Adult Eyes sent plaintiff confirmations of the following pornography purchases to his <u>Temple</u> e-mail address:

---

[3] Plaintiff testified that he "saw nothing wrong" with browsing for, and ordering movies like "Assbusters" on his work computer, while he was supposed to be working.  Exh. 1, page 161.

[4] Where DVD's such as "Bald Beavers", "Cum Shots Deluxe", and "Mila Squirts Las Vegas" were pulled up.  Exh. 2, pg. TEMPLE 0622.

[5] An adult web site showing images of hardcore pornography. Exhibit 2, pp. TEMPLE 0541-542.

4

(1) On Thursday, October 5, 2000 at 3:16 p.m., plaintiff received an e-mail confirming that he ordered "Watcher 3," on Wednesday, October 4, 2000 at 2:00 p.m. <u>See</u> the E-mail, attached as Exhibit 4.[6]

(2) On Monday, October 16, 2000 at 11:27 a.m. plaintiff received an e-mail confirming his purchase of two other movies: "Hit her in the Shitter" and "Angry Anal #2." <u>See</u> the E-mail attached as Exhibit 5.[7]

(3) On Tuesday, November 7, 2000 at 2:40 p.m., Plaintiff received an order confirmation for "Watcher 2" from Adult Eyes. The order was placed that same day at 1:40 p.m. That e-mail is attached as Exhibit 7. In addition, during that same window of time, three (3) pornographic images were downloaded to plaintiff's laptop computer. These are attached collectively as Exhibit 8. Moreover, the DVD cover of "Watcher 2" was located on the hard drive of plaintiff's laptop computer. That image is attached as Exhibit 9.

(4) On Monday, November 13, 2000 at 5 p.m. plaintiff received an order confirmation for "555 Cumshots" from Adult

---

[6] This e-mail and the others like it were recovered by David Chamberlain, a Temple information technology manager tasked with investigating the extent of plaintiff's pornographic access on Temple computer equipment after plaintiff was first suspected of using his computer to gather pornography.

[7] Not only did plaintiff order "Angry Anal 2," an image of "Angry Anal #5" appeared on one of plaintiff's Temple laptop computers. See Exhibit 6.

5

Eyes. Plaintiff placed that order that same day at 1:40 p.m. That e-mail confirmation is attached as Exhibit 10.

In addition to plaintiff's admitted access of pornography no less than thirty (30) times while at work, using Temple computers, Exhibit 1, pp. 160-161; 162-163; 165, there were also approximately an additional 90 pornographic newsgroups saved in his laptop computer.[8] Countless other images were found on the computer as well. A copy of a summary of the audit of only one of plaintiff's Temple issued computer performed by David Chamberlain, an information technology manager, is attached as Exhibit 12.

Based on the above facts and related investigation, plaintiff was terminated on March 4, 2002 for violation of Temple policies governing the use of its equipment and for immoral and indecent behavior – i.e. conduct unbecoming a Temple Employee. See Exhibit 13. Plaintiff then brought this lawsuit in June 2002, alleging he was terminated in violation of the Family Medical Leave Act.

---

[8] A Newsgroup, as defined by dictionary.com is "an area on a network, especially the internet, devoted to the discussion of a specified topic…". On plaintiff's computer, nearly 100 newsgroups were bookmarked with the tag line of "erotica," which is a method for indicating they contain pornography. In addition to text, images are shared in this fashion. A copy of the list of newsgroups located on the plaintiff's computer is attached as Exhibit 11. They include such names as alt.binaries.picures.erotica.anal; alt.binaries.pictures.erotica.hardcore; even alt.binaries.pictures.eroctica.nuns. Exhibit 11 at page 2.

**C. Common decency and Temple Work Rules dictated that Plaintiff be terminated.**

Plaintiff acknowledges receiving the employee work rules at page 89, line 15 of his deposition. <u>See</u> Exhibit 1.

> Q: Were you given a copy of Temple University Work Rules when you started with Temple Hospital?
>
> A: Yes.

A copy of those rules is attached as Exhibit 16, with plaintiff's signed receipt as the last page of the exhibit. The rules at pages "TEMPLE 0342" through "TEMPLE 0344" provide discipline, up to and including, termination of employment for unauthorized use of Temple property or equipment or "immoral or indecent behavior." Despite these rules, plaintiff has the audacity to claim he "see[s] nothing wrong with [accessing and viewing pornography on work computers." Exhibit 1, pg. 161, lines 8 - 15

Plaintiff contends that he only accessed pornography or pornographic websites on about thirty occasions, and purchased only three pornographic videos. Exhibit 1, pg. 159, 162-3, 165; Exhibit 3. He claims he is not responsible for the rest of the voluminous pornography that was downloaded to the computers that Temple provided to him because others had access to his computers and he would sometimes leave them logged on for others to use. Exhibit 1, pg. 129, lines 12 - 14. Even if others he allowed access to his computer downloaded the

7

pornography, his allowing others to use his computers in this way would also have constituted a violation of Temple policy, and plaintiff would be responsible for the activity. See Exh. 20, ¶7.

In fact, one of plaintiff's work duties was to provide other employees with the Hospital's computer policies. See Exh. 1, pp. 78-79. These policies, which plaintiff knew applied to him, (Exh. 1, pp. 78-79) prohibited employees from sharing their passwords to access Hospital computers. See Exh. 20, ¶7.

Again, this admitted violation of Temple's computer use policy was support in itself for plaintiff's discharge, as paragraph 7 of Temple University Hospital Information Systems Policies and Procedures clearly state that in the event of sharing or disclosing passwords, the user "…will be responsible for any misuse." Exh. 20, ¶7.

**D.   The Hospital's investigation was not linked to plaintiff's FMLA leave.**

Plaintiff turned over his laptop computer months before he requested FMLA leave. Likewise, the investigation into his pornography use predated his FMLA application.

The issue of plaintiff's inappropriate use of Temple's computers came to Temple's attention after the Hospital assigned plaintiff use of a new Sony laptop computer and he was instructed to turn over the old Gateway laptop computer to an O.R. Nurse Manager. After the Nurse Manager received

8

plaintiff's Gateway computer, on or about December 30, 2001, she discovered voluminous pornographic materials had been stored on it.  Exhibit 18 (a signed statement by that manager).  As testified to by plaintiff's manager, Marcia Redden, Temple began its investigation as soon as the pornography was discovered. Exhibit 21, pp. 70-73.

On February 20, 2002, while the investigation was in progress, plaintiff submitted a request for intermittent family medical leave to the Hospital's Employee Benefits Department. See Exh. 15.  On February 22, 2002, Temple's Employee Benefits Department approved twelve weeks of leave within a floating twelve month period.  See Exh. 17.

On March 4, 2002, as a result of Temple's investigation into plaintiff's use of work computers to obtain pornography, plaintiff was discharged for "misuse of Temple's property" and "conduct unbecoming a Temple employee."  Exh. 13. Later, at the subsequent Discharge Hearing on April 12, 2002, based on the above evidence and plaintiff's admissions at the hearing, the Discharge Committee unanimously upheld the termination of plaintiff's employment.  See Exh. 19.

Plaintiff then brought this lawsuit in June 2002, claiming that Temple violated the FMLA and defamed him.  After a previous motion for partial summary judgment, plaintiff withdrew

9

his defamation claim without opposition.  Temple now moves for summary judgment on the FMLA cause of action.

## II.  ARGUMENT

A motion for summary judgment shall be granted where all of the evidence demonstrates that there "is no genuine issue of any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P., Rule 56 (c). The moving party has the initial burden of demonstrating that no genuine issue of material fact exists.  Once that burden is met, the non-moving party must present evidence that there is a genuine issue of material fact.  The non-moving party may not rest on the pleadings, but must present evidence of a genuine dispute of a material fact.  See Celotex Corp. v. Catrett, 477 U.S. 317, 323-324 (1986).

### A.  Plaintiff cannot prove an FMLA violation.

In order for the plaintiff to prevail under the FMLA, he must prove that, after exercising his rights under the FMLA, the Hospital "interfere[d] with, restrain[ed], or den[ied] the exercise of or … interfere[d] with, restrain[ed], or den[ied] the exercise of or the attempt to exercise, any right provided…" in the FMLA.  29 U.S.C. §2615(a)(1)(2).  "Claims under the FMLA are generally analyzed using the Mcdonnell-Douglas burden-shifting framework."  Cohen v. Pitcairn Trust Company, 2001 WL 873050 at *5 (E.D. Pa.) (*citing* to McDonnell-Douglas v. Green,

411 U.S. 792 (1973) and <u>Reeves v. Sanderson Plumbing Products</u>, 530 U.S. 133 (2000)); see also <u>Wilson v. Lemington Home for the Aged</u>, 159 F. Supp. 2d 186, 194-5 (W.D. Pa. 2001). The plaintiff must establish a prima facie case, then the burden shifts to the defendant to provide a legitimate rationale for the action, and the burden then shifts back to the plaintiff to discredit that reason as a mere pretext. See <u>Cohen</u>, 2001 WL 873050 at *9.

To demonstrate a prima facie case under the FMLA, the plaintiff must show that (1) the plaintiff is protected under the FMLA, (2) the plaintiff suffered an adverse employment action, and (3) there is a causal connection between that adverse action and the exercise of his rights under FMLA. See <u>Baltuskonis v. US Airways, Inc.</u>, 60 F. Supp. 2d 445, 449-50 (E.D.Pa. 1999); see also <u>Cohen</u>, 2001 WL 873050 at *9.

While plaintiff will point to the proximity in time between his FMLA application and termination to satisfy the third element, that fact does not survive scrutiny because there is no evidence of pretext.

    **1.   Plaintiff's prima facie FMLA case is suspect.**

The only argument plaintiff can make for proving his FMLA claim is that he was terminated within a few weeks after being granted leave.

While temporal proximity of the two events has been considered weak evidence of an FMLA violation, it is not

enough to survive a motion for summary judgment as to his FMLA cause of action since he cannot rebut the patent non-discriminatory reason for the plaintiff's termination. See e.g. Cohen, 2001 WL 873050 at *9; Baltuskonis v. US Airways, Inc., 60 F. Supp. 2d 445, 449-50 (E.D.Pa. 1999) (finding no pretext where sheer proximity in time to termination and FMLA leave is the only link, even if only 6 days); see also Dillon v. Carlton, 977 F. Supp. 155, 1160 (M.D. Fla. 1997) ("The FMLA is not a shield to protect employees from legitimate disciplinary action by their employers if their performance is lacking in some matter unrelated to their FMLA leave").

In Baltuskonis, the plaintiff was terminated for using a forged note to get leave to visit his sick daughter. Despite the fact he claimed innocence in knowing the note was forged, his mere use was a proper, non-discriminatory basis for terminating him, even after his FMLA application. Baltuskonis, 60 F. Supp. 2d at 449. The court held:

> It is clear, however, that [the plaintiff] gave US Airways an altered doctor's note. It is irrelevant whether he altered it or whether different interpretations of the alterations to the note are possible. US Airways received an altered doctor's note from [the plaintiff] and terminated him for fraudulently attempting to receive sick pay.

Id. at 449-450.

In Cohen, the plaintiff contended that her discharge shortly after she took an FMLA maternity leave was

enough to make out a prima facie case because there was no additional evidence of a causal connection between her termination and her request for leave.  The court opined: "The fact that the termination occurred close in time to the request for FMLA leave is not sufficient to carry the plaintiff's burden [of proving a prima facie FMLA case]" and went on to find it unlikely there was even a prima facie case for an FMLA violation.  Cohen, 2001 WL 873050 at *9 (*citations omitted*).

Based on Cohen, plaintiff cannot show he has a prima facie case under the FMLA simply because of a temporal coincidence.  Id. at *9.  Thus, his complaint fails as a matter of law.

> **2. Plaintiff cannot discredit the Hospital's legitimate reason for his termination – in fact, he admits to accessing pornography at work.**

Even if plaintiff had a prima facie FMLA case, to survive summary judgment, he still must demonstrate that there is a genuine factual issue concerning whether the Hospital's stated reasons for his discharge--the misuse of Temple's property and conduct unbecoming a Temple employee as a result of his accessing and purchasing pornography on Temple computers during working hours--were a pretext for FMLA retaliation.

In determining whether there is pretext, the analysis is not whether the employer's reason is correct, it is "…whether the employer was honest in saying that it discharged

13

the plaintiff for the reasons it has given." Cohen, 2001 WL 873050 at *10 (*citations omitted*); see also Williams v. Hewitt Associates, LLC, 2005 WL 742638 (N.D.Ill.) (holding that an employer's termination of an employee for sending pornographic e-mails was valid and there was no evidence that the employer harbored any other motivation). The role of a court in this circumstance is "not to decide whether or not [the defendant's] business decision was correct, but whether or not plaintiff's present evidence that call into question whether [the defendant] actually believed the reason it proffered." Williams, *supra*, 2005 WL 742638 at *3 (holding that receiving and sending pornographic e-mails is a legitimate, non-discriminatory reason for termination).

> A "plaintiff cannot simply show that the employer's decision was wrong or mistaken, since the factual dispute at issue is whether discriminatory animus motivated the employer, not whether the employer is wise, shrewd, prudent, or competent… Rather the non-moving plaintiff must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them 'unworthy of credence'…"

Fuentes v. Perskie, 32 F. 3 758, 765 (3d Cir. 1994) (emphasis added); Holmes v. Pizza Hut of America, 1998 EL 564433 (E.D. Pa.) (*citing* Fuentes at length and finding that an employee's violations of company policy before an FMLA leave constitute proper grounds for termination); see also Baltuskonis, *supra*, 60 F. Supp. 2d at 449-450.

The mere proximity in time between FMLA leave and termination does not support a finding of pretext—there must be something more. In this case, there is nothing more. "Mere conjecture that an employer's explanation for an adverse employment action is pretext for intentional discrimination is an insufficient basis for denial of summary judgment in an employment discrimination claim." Holmes v. Pizza Hut of America, 1998 WL 564433 (E.D. Pa.)

Simply stated, plaintiff admits to searching several pornographic websites for DVD pornography on Hospital computers, on Hospital time. See Exh. 1, pp. 159-163 & 165. He admits to ordering pornographic DVD's, whose titles alone would make an average person blanch. See Exh. 3. The covers and titles of the DVD's and related pornography on those sites leave no question as to what the DVD's contain. See Exh.'s 3 — 7 & 10. There was and is ample evidence that this was not an isolated event, and in fact, plaintiff admits it was not. See Exh. 1, 159-163, 165. Plaintiff's admitted conduct was reprehensible and grounds for termination under Hospital policies and normal standards of decorum in the workplace. See Exh. 16, ¶¶17(a), 17(b), & 23(b). Worse still, and further supporting plaintiff's termination, is that plaintiff is not apologetic for his actions, as he "didn't see anything wrong

with [viewing pornography on Temple computers."  Exh. 1 161, lines 8 – 15.

Plaintiff's pornography viewing and purchasing exposed the Hospital to possible risks of harassment lawsuits, embarrassment, and internet security issues associated with downloading pornography from unsecured adult websites.  While plaintiff disputes the scope of his own involvement with the pornographic websites, see generally Exhibit 14, that dispute is immaterial in light of plaintiff's admitted inappropriate conduct.

After all, as in <u>Baltuskonis</u>, even though the plaintiff there claimed he was not involved in creating the fraudulent note to get sick leave, that dispute was not enough. His employer's receipt of the note (though he disputed the scope of his involvement) was enough to justify termination.  60 F. Supp 2d, at 449-450.

Thus, like a child caught misbehaving, plaintiff admits to some of the wrongdoing and will not admit to all of it.  Regardless, his blatant (and admitted) misuse of Temple resources and work time necessitated his dismissal.

### III. CONCLUSION

For each of the foregoing reasons, the Hospital is entitled to summary judgment in its favor and against plaintiff on

plaintiff's FMLA claim in Count One of his complaint and, therefore, the complaint should be dismissed, with prejudice.

Respectfully submitted,

/s/ Neil J. Hamburg
NEIL J. HAMBURG

Attorney No. 32175
HAMBURG & GOLDEN, P.C.
1601 Market Street, Suite 3310
Philadelphia, PA  19103-1443
(215) 255-8590

Counsel for Defendant
Temple University Hospital