# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

LESLAW J. KORNECKI

     v.

TEMPLE UNIVERSITY HOSPITAL

CIVIL ACTION

NO. 02-3708

## O R D E R

AND NOW, this _____ day of June, 2006, upon consideration of defendant's Motion for Summary Judgment, opposition thereto, and the record as a whole, it hereby is ORDERED that the said motion is DENIED.

BY THE COURT:

_____

NORMA SHAPIRO, J.

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

LESLAW J. KORNECKI

     v.

TEMPLE UNIVERSITY HOSPITAL

CIVIL ACTION

NO. 02-3708

### PLAINTIFF'S OPPOSITION TO
### DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

NOW COMES plaintiff Leslaw J. Kornecki ("Kornecki"), by and through his undersigned counsel, Bochetto & Lentz, P.C., and, for the reasons stated in his within Statement of Genuinely Disputed Material Facts and supporting memorandum (each incorporated herein), hereby opposes defendant Temple University Hospital's ("Temple") motion for summary judgment sought pursuant to Fed. R. Civ. P. 56.

WHEREFORE, Kornecki respectfully requests this Honorable Court deny Temple's said motion, enter an Order of the substance submitted herewith, and grant Kornecki such other relief that the Court deems appropriate under the circumstances.

Respectfully submitted,

**BOCHETTO & LENTZ, P.C.**

By: _____
George Bochetto
Stephen E. Skovron
1524 Locust Street
Philadelphia, PA  19102
Ph: (215) 735-3900
Fx: (215) 735-2455

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

LESLAW J. KORNECKI

       v.

TEMPLE UNIVERSITY HOSPITAL

CIVIL ACTION

NO. 02-3708

### KORNECKI'S STATEMENT OF
### GENUINELY DISPUTED MATERIAL FACTS

Kornecki hereby states material facts he genuinely disputes with Temple, including with respect to Temple's motion for summary judgment:

### Hired

1.     July 6, 1998 was Kornecki's first day of employment with Temple.

**Exhibit A** (Temple June 30, 1998 letter to Kornecki), ¶ 1.

### Job Description

2.     Kornecki's job title was "Manager, Operating Room Computer Operations." Id.

3.     Temple's "Position Description" with respect to that job reads as follows under the section entitled "Summary of Position:"

> Manages Operating Room computer system and directs
> programming and operations staff. Installs, implements and
> operates O.R. computer system, associated equipment interfaces,
> on-line terminal network and remote computer sites.

**Exhibit B** (Position Description), 1 (Summary of Position).

4.     That Position Description also has a section entitled "Essential Functions of Position." Id. (Essential Functions of Position).

5.    Those Essential Functions evince the job holder's computer expertise.  See id.

## Performance Review 1

6.    In October 1999, Temple reviewed Kornecki's job performance.  **Exhibit C** (Temple "Criteria Based Performance Evaluation" of Kornecki dated Oct. 30, 1999).

7.    The "Rating Scale" for that evaluation indicates that, for each job performance measure reviewed:

a.    a rating of 0 means deficient performance;

b.    a rating of 1 means partially meets standard performance, but needs improvement;

c.    a rating of 2 means consistently meets standard performance;

d.    a rating of 3 means exceeds standard performance.

Id. at 2 (Rating Scale).

8.    Of the thirty job performance measures Temple reviewed in Kornecki's 1999 evaluation, Temple determined that Kornecki consistently met, or exceeded, all of them.  Id. at 3-6 (Bates stamp p. nos. Temple 0101-04).

9.    In that performance evaluation, Temple remarked about Kornecki, including as follows:

> During the 'lull' between date of hire & selection, Les assumed the responsibility for coordinating & tracking the Retro Billing project for the OR implants.  This resulted in ***several million dollars of increased billing & potential revenue*** for TUH.

Id. at 7 (Bates stamp p. no. Temple 0105), ¶ 1 (emphasis supplied).

2

**Performance Review 2**

10.    In June 2000, Temple reviewed Kornecki's job performance a second time.

**Exhibit D** (Temple Criteria Based Performance Evaluation of Kornecki dated June 7, 2000).

11.    Of the thirty-three job performance measures Temple reviewed in

Kornecki's 2000 evaluation, Temple determined that Kornecki consistently met, or exceeded, all

of them. Id. at 1-4 (Bates stamp p. nos. Temple 0044-47).

12.    In that performance evaluation, Temple remarked about Kornecki,

including as follows:

> Les has done an ***excellent job*** assisting Peri Op Services develop
> appropriate tools to monitor performance.  He has willingly
> expanded his role to assist other TUHS OR suites such as TUCMC
> [Temple Univ. Childrens' Medical Center] & NEH [Northeast
> Hospital].

Id. at 7 (Bates stamp p. no. Temple 0048), ¶ 2 (emphasis supplied).

**Performance Review 3**

13.    In November 2001, Temple reviewed Kornecki's job performance a third

time.  **Exhibit E** (Temple Criteria Based Performance Evaluation of Kornecki dated Nov. 11,

2001).

14.    Of the thirty-seven job performance measures Temple reviewed in

Kornecki's 2001 evaluation, Temple determined that Kornecki consistently met, or exceeded, all

of them. Id. at 2-5 (Bates stamp p. nos. Temple 0023-26).

15.    In that performance evaluation, Temple remarked about Kornecki,

including as follows:

3

> We will require Les's *expertise* in the development of various
> reports & monitoring tools as we continue to implement new
> programs.

Id. at 6 (Bates stamp p. no. Temple 0027), ¶ 4 (emphasis supplied).

16.     Marcia Redden was Kornecki's supervisor at Temple.  **Exhibit F**
(transcript of M. Redden May 26, 2004 deposition ("Redden NT")), 44.

17.     While Redden was Kornecki's supervisor, Kornecki possessed a Gateway
laptop computer Temple issued to him.  Id. at 70.

18.     Temple replaced that laptop computer with a Sony laptop computer.  Id.

19.     For awhile, Kornecki possessed both.  Id.

20.     In November 2001, Redden told Kornecki "to 'clean up' the old files on the
[Gateway] laptop and transfer the unit to Elaine [Joyce, a nurse]."  **Exhibit G** (Redden Apr. 8,
2002 email to D. Chamberlain (embedded in Chamberlain Apr. 9, 2002 email to Redden)), item
no. 3.  See also **Exhibit F** (Redden NT), 70.

21.     After Kornecki transferred the Gateway laptop to Joyce, Joyce found
pornography on it.  Id. at 71-72.

22.     Joyce memorialized the circumstances surrounding her discovery ("Joyce
Memo").  **Exhibit H** (Joyce Memo).

23.     Upon receipt of the Gateway laptop, Joyce tried to connect it with a
Comcast high-speed cable line at home, but was not successful.  Id. at ¶¶ 1-2.

24.     Joyce interacted with a Comcast customer service person in an effort to
complete the high-speed cable line hook-up.  Id. at 2.

25.     During that interaction, Joyce enabled a screen to appear on the Gateway

4

laptop entitled "Comcast for Les Kornecki," and that screen "was filled with thousands of e-mail and Internet sites, which were all of a pornographic nature." Id., penultimate sentence.

26.    The next day, Joyce took the Gateway laptop into work to discuss her discovery with Redden and, while she waited for Redden, discussed the Gateway laptop with a physician-employee whom Joyce believed knew more about computers than she did. Id. at ¶ 3.

27.    Joyce and physician enabled the same screen Joyce had seen the night before, entitled "Comcast for Les Kornecki," and the physician then "tried to access the hard drive by typing in *.jpeg files, [and] what appeared was several thousand files which had very suggestive names to them." Id.

28.    Redden joined Joyce and the physician. **Exhibit F** (Redden NT), 72.

29.    Redden then turned the Gateway laptop over to David Chamberlain to investigate. Id.; id. at 74-75.

30.    Redden ultimately concluded that Kornecki had misused Temple property and had engaged in conduct unbecoming a Temple employee. Id. at 76, 78, 80.

31.    Redden testified, however, that use of a pen issued by Temple to one of its employees to write something not connected with Temple business would not constitute conduct unbecoming a Temple employee because "[i]t's not pornographic." Id. at 81.

32.    David Chamberlain exclusively assessed computers issued by Temple to Kornecki for the presence of pornography or trails showing access to pornographic websites. **Exhibit I** (transcript of D. Chamberlain July 9, 2004 deposition ("Chamberlain NT")), 13-14 ("I was the only one who touched this equipment").

33.    Chamberlain assessed four such computers--two laptop computers and two

5

desktop computers--and discovered (a) pornographic images recorded on the hard drives of the laptop computers, and (b) evidence that pornographic websites had been visited with one of the desktop computers. Id. at 15-16.

34.     Some of the evidence upon which Temple relied to conclude that Kornecki misused Temple property and engaged in conduct unbecoming a Temple employee is an "Outlook Express" table found on the Gateway laptop computer, which table contained "folders" with patently pornographic titles. Id. at 58-61 & Exhibit C-1 (Outlook Express table).

35.     *Chamberlain did not discover, and cannot have discovered, how that collection of data became recorded on that computer*. Id. at 60 (Q: "You don't have any idea who set that up?" A: "I do not"); 72 ("[Y]ou have no idea . . . how any of the sub-files [appearing on Exhibit C-1] became associated with . . . the Gateway lap top?" A: "I do not.  That is accurate")

36.     *Chamberlain did not discover, and cannot have discovered, whether Kornecki (or any person) ever visited any of the sub-files identified in the Outlook Express table*. Id. at 87-88 ("There's no way I can find out whether somebody actually clicked on [any of the sub-files]").

37.     Chamberlain made notes about entries on the Gateway laptop that *he believed* described pornographic images. Id. at 88-89; 106 (Q: "Did you visualize [an image]?" A: "I may have just been looking for j-peg files that indicated pornographic--pornographic images or pornographic in nature"). See also Exhibit C-3.

38.     *Chamberlain did not discover, and cannot have discovered, how those entries became recorded on the Gateway laptop*. Id. at 100, 103-04 (Q: "[W]ho saved that?  A:

6

"I don't know").

39.    According to Chamberlain, it would have taken ten-to-fifteen seconds to download a single image for viewing on the Gateway laptop. Id. at 124.

40.    Chamberlain downloaded pages of images and pages of internet website addresses from the four computers he investigated and identified as exhibits during his deposition, as follows: Exhibits C-8, C-9, C-10, C-11, C-12, C-13, C-14, C-15, C-16, C-17. Id. at 151 (re: C-8), 153 (re: C-9), 155 (re: C-10), 158 (re: C-11), 172 (re: C-12), 181 (re: C-13), 183 (re: C-14), 184 (re: C-15, C-16, and C-17).

41.    ***Chamberlain did not discover, and cannot have discovered, how those images, or internet website addresses, became recorded on any of those computers***:

> Q:    No document that we've reviewed today identifies Mr. Kornecki as the person who performed key strokes that caused any pornographic images to be resident on any computer or any pornographic websites to be visited by any computer. Is that true?
>
> A:    By Mr. Kornecki? Correct.

Id. at 184.

42.    On February 20, 2002, Kornecki applied for intermittent leave pursuant to the FMLA, and Redden signed that application. **Exhibit J** (FMLA Application).

43.    Kornecki sought leave to care for his daughter, who had been diagnosed with leukemia. Id. at 2, 4.

44.    On February 22, 2002, Temple granted that FMLA leave to Kornecki. **Exhibit K** (FMLA Grant).

7

45.    On March 4, 2002, Kornecki was terminated for misuse of Temple property and conduct unbecoming a Temple employee.  **Exhibit L** (Temple Mar. 4, 2002 letter to Kornecki).

46.    Kornecki denied downloading pornographic images onto any computer Temple ever issued to him, or visiting pornographic websites via any computer Temple ever issued to him.  **Exhibit M** (transcript of July 25, 2005 Kornecki deposition (Kornecki NT)), 4-14.

47.    Kornecki admitted he purchased about five pornographic videos via a computer Temple issued to him.  Id. at 66-76.

48.    The Temple University Work Rules do not identify any manner of misconduct, act, or omission as "conduct unbecoming a Temple employee."  **Exhibit N** (Temple Work Rules).

49.    The Temple Work Rules prohibit the unauthorized use of Temple property. Id. at 7 (Bates stamp p. no. Temple 0342).

50.    The first such offense thereof mandates a written warning, and the second offense thereof mandates a three day suspension, and the third offense thereof mandates termination.  Id. at 7, 2 (Bates stamp p. no. Temple 0337), penultimate paragraph.

51.    Such an offense mandates termination if and only if the unauthorized use "results in injury or economic loss to Temple."  Id. at 8 (Bates stamp p. no. Temple 0343), 1st entry.

52.    No evidence was presented at Kornecki's termination hearing that any act he performed or omitted resulted in injury or economic loss to Temple, according to the chairman of that hearing, James Mohan.  **Exhibit O** (transcript of May 27, 2004 J. Mohan deposition), 55-

8

58.

53.     Mohan testified that Kornecki cannot have been discharged for unauthorized use of Temple property in the absence of such injury or economic loss.  Id. at 62 ("If one is to follow the work rules strictly your interpretation would be correct").

54.     Mohan testified that he did not know whether Kornecki visualized any of the pornography claimed to have been resident on the computers issued to him.  Id. at 73 ("I don't know for a fact that he did").

55.     Following his termination, Kornecki applied for Unemployment Compensation benefits.  **Exhibit P** (Unemployment Comp. Application).

56.     Temple contested Kornecki's application.  **Exhibit Q** (Unemployment Comp. Award).

57.     Kornecki was awarded unemployment compensation benefits because "the Employer [Temple] has not sustained its burden of proof and benefits must be allowed."  Id., ¶ 2.

Respectfully submitted,

**BOCHETTO & LENTZ, P.C.**

By: _____
George Bochetto
Stephen E. Skovron
1524 Locust Street
Philadelphia, PA  19102
Ph:  (215) 735-3900
Fx:  (215) 735-2455

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

LESLAW J. KORNECKI

     v.

TEMPLE UNIVERSITY HOSPITAL

CIVIL ACTION

NO. 02-3708

## MEMORANDUM OF LAW SUPPORTING
## PLAINTIFF'S OPPOSITION TO
## DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

**I.**       **SUMMARY**

First and foremost, this case does ***not remotely*** regard child pornography, or children, or any minor, in any respect whatever and, for that matter, defendant Temple University Hospital never contended otherwise.

Rather, this case involves an acknowledged computer expert who applied for and was granted leave pursuant to the Family Medical Leave Act and also admitted purchasing four or five pornographic videos via his Temple-issued computer, but who nevertheless was fired on the ***pretext*** that he had consumed (visualized) thousands and thousands of pornographic images via that and other Temple-issued computers.

Temple's defense of Kornecki's FMLA retaliation claim is weak, implausible, and incoherent. Moreover, in firing Kornecki meritlessly, Temple rode roughshod over its own documented policies and procedures. Either of those two findings--implausible explanation; procedural irregularity--renders this inquiry a jury question: Whether Temple's proffered explanation for firing Kornecki is a pretext for its true motivation--his granted FMLA leave.

And of course, as a matter of law, all doubts concerning pretext in a case such as

this always are resolved in favor of plaintiff.

And those doubts predominate the cold record.

Chief among them is Kornecki's acknowledged computer expertise. According to Temple's documented job description applicable to Kornecki, he was required to have been a computer expert before even being granted an interview. Additionally, in three different job performance evaluations conducted in three different, successive years, Temple uniformly rated Kornecki as meeting, or exceeding, every single one of thirty-plus performance measures, most of them regarding computer expertise. All this gives rise to this implausibility: An acknowledged computer expert leaves a patent trail of his pornography consumption on a lap top computer (issued by the employer) that he was ordered to "clean up" and transfer to a co-employee.

For that matter, though Temple produces reams and reams of documents of computer entries that include clearly pornographic subject matter, its sole technical investigator, David Chamberlain, candidly admits on cross examination, time and again, that *neither he nor anyone else ever could identify Kornecki as being responsible* for causing the pornography trail to reside on the subject hardware. Yet it is those reams and reams of pornographic entries that form the basis of Temple's decision to fire Kornecki, rather than the comparatively trivial purchase of an handful of videos he ordered, from work, to be delivered to his home.

Moreover, Temple fired Kornecki for two reasons, it said: Misuse of Temple property and Conduct unbecoming a Temple employee.

The latter reason does not appear in the work rules Temple issued to Kornecki when he was hired. It just is not there, expressly or by reasonable implication, and the record makes it clear that Temple simply made up the termination classification when it meritlessly

2

decided Kornecki must be some kind of sexual predator or hapless pornography addict.

This type of policy deviation or procedural irregularity gives rise to an inference that Temple's proffered explanation is pretextual, an issue the jury must decide.

For that matter, according to its own work rules, when an employee is sanctioned for misuse of Temple property (a.k.a. unauthorized use of Temple property) for the first time--as was Kornecki in this case--the discipline to be meted out is a written warning. When such an employee is so sanctioned for the second time, the discipline to be meted out is three days' suspension. Such an employee only may be fired when so sanctioned for the third time, according to Temple's policy.

On the other hand, an exception to that rule is stated in the work rules: Such an employee may be fired if, as a result of having misused Temple property, Temple sustains injury or economic harm. But, in this case, the chairman of the committee that oversaw and participated in Kornecki's termination hearing testified, unambiguously, that not one scintilla of evidence was presented at his hearing that Temple had sustained injury or economic harm as a result of Kornecki's "misuse."

Accordingly, Kornecki's very termination, and the hearing accompanying it, were fraught with procedural irregularity and/or policy deviation that necessarily gives rise to this question: Whether Temple's proffered explanation is a pretext. That question, in a case whose record is as this record, is for the jury alone.

For the foregoing reasons, as elaborated upon below, Temple's summary judgment motion should be denied.

3

## II.    DECISIONAL STANDARD

Kornecki herein incorporates Temple's memorandum of law supporting its summary judgment motion, 10, ¶ 2, as the decisional standard guiding this Court in deciding Temple's said motion.

## III.    FACTS

Kornecki herein incorporates his Statement of Genuinely Disputed Material Facts ("Fact Statement") as his statement of facts necessary to be known to decide Temple's said motion.

## IV.    ARGUMENT

### A.    Substantive Law

Kornecki herein incorporates Temple's memorandum of law supporting its summary judgment motion, 10, ¶ 3 & 11, ¶¶ 1-2, as the substantive law, in part, informing this Court's decision on Temple's said motion.  Kornecki supplements same as follows.

Proximity in time between the exercise of FMLA rights and an adverse employment action infers a causal connection between the two sufficient to withstand summary judgment.  Baltuskonis v US Airways, 60 F. Supp. 2d 445, 448 (E.D. Pa. 1999) (six day proximity raises causation inference for jury).

After FMLA plaintiff establishes his prima facie case, the employer-defendant must proffer a nondiscriminatory explanation for why it took the adverse employment action at issue.  Id. at 448-49.

After the employer-defendant proffers that explanation, FMLA plaintiff must show the explanation is a pretext, as follows:

4

> point to some evidence, direct or circumstantial, from which a
> factfinder could reasonably either (1) disbelieve the employer's
> articulated legitimate reasons; or (2) believe that an invidious
> discriminatory reason was more likely than not a motivating or
> determinative cause of the employer's action.

Id. at 449.

> Plaintiff may accomplish either of those ends as follows: Identifying
> weaknesses, implausibilities, inconsistencies, incoherencies, or
> contradictions in the employer's proffered legitimate reasons (such)
> that a reasonable factfinder could rationally find them unworthy of
> credence.

Id. (internal quotes and citations omitted).

Moreover, evidence of procedural irregularities or deviations from policies on the part of the employer may establish pretext. E.g., Doebele v. Sprint / United Mgt. Co., 342 F.3d 1117, 1138-39 (10th Cir. 2003). See also Massey v. United States Customs and Border Protection, No. Civ.A. 03-6590, 2004 WL 3019234, at *8 (E.D. Pa. Dec. 28, 2004); Royer v. Pennsylvania State Univ., 84 Fed. Appx. 226, 227 (3d Cir. 2004) (Per curiam; Opinion marked "Not Precedential" pursuant to IOP).

**B.      Substantive Law applied to Facts**

1.      Weaknesses Implausibilities Incoherencies

Kornecki's computer expertise--as attested to in Temple's own documents (e.g., Position Description, including Essential Functions, Performance Reviews 1, 2, and 3)--renders weak, implausible, and incoherent Temple's proffered legitimate explanation for firing him because, Kornecki submits, no person as expert in computers as he would have left a trail of pornography consumption on any computer.

5

On this basis alone, whether Temple's proffered explanation is a pretext becomes a jury question, therefore Temple's summary judgment motion should be denied. See Baltuskonis, 60 F. Supp. 2d at 449.

Kornecki's direct instruction from his then-boss Redden, to "clean up" the Gateway lap top and turn it over to Nurse Joyce, in light of his computer expertise, renders weak, implausible, and incoherent Temple's proffered legitimate explanation for firing him because, Kornecki submits, no person as expert in computers as he would have left a trail of pornography consumption on any computer he expressly was ordered to "clean up" and turn over to a fellow employee.

On this basis alone, whether Temple's proffered explanation is a pretext becomes a jury question, therefore Temple's summary judgment motion should be denied. See id.

Temple's sole investigator into the pornography evidence recorded on the computers at issue, David Chamberlain, testified unequivocally that he did not identify, and was not capable of identifying, Kornecki as the person who literally caused that evidence to be present on any computer Temple investigated (as by performing the key strokes that would have resulted in the computer recording same). Fact Statement, ¶¶ 40-41. See also id. at ¶¶ 34-38.

Necessarily then, Temple *inferred* Kornecki caused that evidence to be present on any computer Temple investigated because those computers had been issued to him.

But that inference is unreasonable in light of Chamberlain's own admission that it would have taken ten-to-fifteen seconds to view a single image on the Gateway lap top, id. at ¶ 39, the computer that started the investigation, id. at ¶ 29. Given that estimate from Temple's chief

"liability" witness, Kornecki would have had to consume one minute to view 4.8 images, and one hour to view 288 images. The pages upon pages of pornographic material Temple produced as indicating Kornecki's alleged wrongful acts, see, e.g., **Exhibit I** (Chamberlain NT), Exhibits thereto, would have taken days upon days upon days for Kornecki to consume, and all while working in an Operating Room environment, see, e.g., **Exhibit A** (Job Description).

 Temple's proffered explanation therefore is implausible, weak, and incoherent.

 On this basis alone, whether Temple's proffered explanation is a pretext becomes a jury question, therefore Temple's summary judgment motion should be denied. See Baltuskonis, 60 F. Supp. 2d at 449.

 Temple could not sustain its burden of proof in contesting Kornecki's application for unemployment compensation benefits, Fact Statement, ¶¶ 55-57 & **Exhibit Q** (Unemployment Comp. Award), rendering Temple's proffered explanation implausible and weak.

 On this basis alone, whether Temple's proffered explanation is a pretext becomes a jury question, therefore Temple's summary judgment motion should be denied. See Baltuskonis, 60 F. Supp. 2d at 449.

 At the very least, on the foregoing bases, collectively, whether Temple's proffered explanation is a pretext becomes a jury question, therefore Temple's summary judgment motion should be denied. See Baltuskonis, 60 F. Supp. 2d at 449.

 2. Procedural Irregularities / Policy Deviations

 Temple Work Rules do not identify "conduct unbecoming a Temple employee" as a basis upon which any employment action may have been taken against Kornecki. **Exhibit N**

7

(Temple Work Rules).

Kornecki nevertheless was fired therefor, in part. **Exhibit L** (Temple Mar. 4, 2002 letter to Kornecki).

Kornecki submits that firing an employee for a reason not identified as a basis upon which an employee may be fired is a procedural irregularity and/or policy deviation of the character that renders the following a jury question: Whether Temple's proffered explanation is a pretext. See, e.g., Doebele, 342 F.3d at 1138-39. See also Massey, 2004 WL 3019234, at *8; Royer, 84 Fed. Appx. at 227 (*Not Precedential*).

On this basis alone, whether Temple's proffered explanation is a pretext becomes a jury question, therefore Temple's summary judgment motion should be denied. See Baltuskonis, 60 F. Supp. 2d at 449.

According to Temple's work rules, the first time a person is found to have misused Temple property (a.k.a. used in an unauthorized manner) is an offense that results in a written warning. **Exhibit N** (Temple Work Rules), 7 (Bates stamp p. no. Temple 0342).

The first time Kornecki was found to have misued Temple property he was fired and was not issued a written warning. See, e.g., **Exhibit L** (Temple Mar. 4, 2002 letter to Kornecki).

Kornecki submits that firing an employee for a reason identified as a basis upon which an employee may be issued a written warning is a procedural irregularity and/or policy deviation of the character that renders the following a jury question: Whether Temple's proffered explanation is a pretext. See, e.g., Doebele, 342 F.3d at 1138-39. See also Massey, 2004 WL 3019234, at *8; Royer, 84 Fed. Appx. at 227 (*Not Precedential*).

8

On this basis alone, whether Temple's proffered explanation is a pretext becomes a jury question, therefore Temple's summary judgment motion should be denied.  See Baltuskonis, 60 F. Supp. 2d at 449.

Temple's work rules provide for the firing of an employee for misuse of Temple property if, as a result thereof, Temple is injured or caused to sustain economic harm.  **Exhibit N** (Temple Work Rules), 8 (Bates stamp p. no. Temple 0343).

David Chamberlain, chairman of the committee that oversaw and directly participated in Kornecki's termination hearing, testified unequivocally that no evidence of injury or economic harm to Temple as a result of Kornecki's alleged misuse of property was presented at Kornecki's termination hearing.  Fact Statement, ¶ 52.

Kornecki nevertheless was fired therefor, in part.  **Exhibit L** (Temple Mar. 4, 2002 letter to Kornecki).

Kornecki submits that firing an employee for an identified reason in the absence of any evidence supporting two-thirds of the elements of that reason is a procedural irregularity and/or policy deviation of the character that renders the following a jury question: Whether Temple's proffered explanation is a pretext.  See, e.g., Doebele, 342 F.3d at 1138-39.  See also Massey, 2004 WL 3019234, at *8; Royer, 84 Fed. Appx. at 227 (*Not Precedential*).

On this basis alone, whether Temple's proffered explanation is a pretext becomes a jury question, therefore Temple's summary judgment motion should be denied.  See Baltuskonis, 60 F. Supp. 2d at 449.

At the very least, on the foregoing bases, collectively, whether Temple's proffered explanation is a pretext becomes a jury question, therefore Temple's summary judgment motion

should be denied.  See Baltuskonis, 60 F. Supp. 2d at 449.

**V.**          **CONCLUSION**

WHEREFORE, Kornecki respectfully requests this Honorable Court deny

Temple's summary judgment motion, enter an Order of the substance submitted herewith, and

grant Kornecki such other relief that the Court deems appropriate under the circumstances.

Respectfully submitted,

**BOCHETTO & LENTZ, P.C.**


By:  _____
George Bochetto
Stephen E. Skovron
1524 Locust Street
Philadelphia, PA  19102
Ph: (215) 735-3900
Fx: (215) 735-2455

10

**CERTIFICATE OF SERVICE**

I certify I caused a true and complete copy of the within *Plaintiff's Opposition to Defendant's Motion for Summary Judgment* to be served upon those listed below by postage prepaid regular mail deposited on April 19, 2006:

Neil J. Hamburg, Esquire
HAMBURG & GOLDEN, PC
1601 Market Street
Suite 565
Philadelphia, PA  19103

_____
Stephen E. Skovron, Esquire